UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

AMBAC ASSURANCE CORPORATION,

                    Plaintiff,

                -against-

THE BANK OF NEW YORK MELLON,

                    Defendant.

---------------------------------------------------------------------- X

17 Civ. 3804 (UA)

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

Plaintiff Ambac Assurance Corporation ("Ambac" or "Plaintiff"), for its First Amended Complaint against defendant The Bank of New York Mellon ("BONY" or "Trustee" or "Defendant"), alleges as follows:[1]

## NATURE OF THE ACTION[2]

1.      This action arises out of BONY's failure as a Trustee to protect the holders of certain senior bonds that Plaintiff Ambac insures. BONY's acting as a Trustee for both senior and subordinated bondholders at the same time has presented and continues to present an intractable conflict of interest in the circumstances described herein, and has caused and will continue to cause direct and foreseeable harm to Ambac, in breach of BONY's contractual, fiduciary, and other duties to Ambac and the senior bondholders Ambac insures.

---

[1] This action was initiated in the Supreme Court of the State of New York (New York County) ("New York Supreme Court") under index number 652356/2017. On May 19, 2017, BONY filed a notice of removal of this action from New York Supreme Court to this Court. Ambac reserves the right to seek remand of this action to New York Supreme Court in accordance with 48 U.S.C. § 2166(d)(2).

[2] Capitalized terms used but not defined in this section of the Complaint are given the meanings ascribed to them elsewhere in the Complaint.

2.      Rather than resign as Trustee, or at least allow a co-trustee to serve with it, BONY has acted and continues to act in its conflicted capacity, all the while collecting substantial fees. By so doing, BONY has inflicted and will continue to inflict enormous harm on the very persons it is duty-bound to protect:  Ambac and its insureds.

3.      In this action, Ambac seeks redress for harm that it has already incurred and seeks to stem further harm that will inevitably result unless BONY is either removed or resigns as Trustee for the senior bondholders.

4.      Ambac is a monoline insurer that provides financial guarantee insurance for more than $800 million in gross face amount of outstanding senior capital appreciation bonds (the "Senior CAB Bonds") issued by the Puerto Rico Sales Tax Financing Corporation, known in Spanish as Corporación del Fondo de Interés Apremiante ("COFINA"), pursuant to the terms of the Amended and Restated Sales Tax Revenue Bond Resolution as amended, restated, modified, and/or supplemented (the "Resolution").  Ambac is a named beneficiary under the Resolution. Ambac is also itself a holder of bonds issued by COFINA.

5.      The Senior CAB Bonds do not provide for regular interest payments, but rather accrue interest until maturity many years in the future.  However, COFINA has also issued Senior Cash Pay Bonds whose holders are paid periodic cash interest payments on a current basis (the "Senior Cash Pay Bonds", and together with the Senior CAB Bonds, the "Senior Bonds"). COFINA has also issued Subordinate Cash Pay Bonds whose holders are paid periodic cash interest payments on a current basis (the "Subordinate Cash Pay Bonds", and together with the Senior Cash Pay Bonds, the "Cash Pay Bonds").  Further, COFINA has issued Subordinated

28538921

Capital Appreciation Bonds, which do not have regular interest payments (the "Subordinate CAB Bonds", and together with the Subordinate Cash Pay Bonds, the "Subordinate Bonds").[3]

6.      COFINA's solvency and financial viability have been placed in jeopardy by the Commonwealth of Puerto Rico's (the "Commonwealth") waging a direct attack on COFINA, putting the legal mechanisms in place to unlawfully and unconstitutionally take COFINA's property, which would result in COFINA having insufficient assets to honor its obligations to the holders of the COFINA Bonds (collectively, the "Bondholders").  If the Commonwealth, with COFINA's acquiescence, were not seeking to seize property that belongs to COFINA, COFINA would remain solvent and viable.  However, since September 2015, there have been at least seven material Events of Default by COFINA and the Commonwealth that threaten COFINA's solvency.

7.      These Events of Default provided BONY the power—and in fact imposed on it the duty—to take remedial action to protect all of the Bondholders and Ambac as an insurer of Senior CAB Bonds.  BONY's refusal to do so—despite repeated requests from holders of Senior Bonds—has benefited the holders of Subordinate Bonds to the detriment of holders of Senior Bonds, in violation of BONY's obligation to act on behalf of all Bondholders with undivided loyalties and to avoid any conflicts of interest.

8.      Time and time again, these Events of Default were brought to the attention of BONY.  Yet BONY ignored them until May 1, 2017, when it wrote to COFINA and the Puerto Rico Fiscal Agency and Financial Advisory Authority (in Spanish, Autoridad de Asesoría y Agencia Fiscal de Puerto Rico) ("AAFAF") (another agency of the Commonwealth), recognizing that the Commonwealth and COFINA had violated the Resolution.  In its letters, BONY

---

[3] As used herein, "COFINA Bonds" refers, collectively, to all Senior Bonds and Subordinate Bonds.

complained that the Fiscal Plan Compliance Law (defined below) undermined the pledge of Dedicated SUT Revenues (defined below as the Pledge) and demanded that by May 3, 2017, COFINA and AAFAF set forth in detail the actions COFINA and the Commonwealth "will take to defend, preserve, and protect the pledge of the Pledged Property against the Commonwealth's claim to the Pledged Property under the Fiscal Plan Compliance Law and any effort by the Governor to utilize the Pledged Property pursuant to the [Fiscal Plan Compliance Law]."

9.      On May 4, 2017, Ambac and a number of holders of Senior Bonds (together representing more than 25% of the principal amount of outstanding Senior Bonds) wrote to BONY pursuant to Section 1102(1) of the Resolution, noting that, "as explained in numerous letters to the Trustee, there have occurred and continue to occur multiple Events of Default under the Resolution."  Ambac and such Bondholders demanded three things, namely that:  (1)  "the Trustee declare the principal of and accrued interest on all senior COFINA Bonds outstanding to be immediately due and payable"; (2) "the Trustee make demand for payment upon COFINA in an amount sufficient to pay principal of . . . and interest on the accelerated Bonds to the date established for payment thereof;" and (3) "the Trustee proceed to protect its rights and the rights of the COFINA Senior Bondholders through the exercise of any and all remedies" in the Resolution.

10.      Also on May 4, 2017, BONY finally issued a notice of default (the "Default Notice") to COFINA.   Yet, instead of declaring an immediate Event of Default, BONY requested that the Commonwealth and COFINA attempt to cure the defaults within 30 days, despite the obvious incurability of the defaults, the Commonwealth's effective repudiation of the Resolution, and the Commonwealth and COFINA's failures to provide any comfort to BONY's previous requests for assurance.  BONY's refusal to declare an Event of Default and accelerate

the Senior Bonds constituted yet another failure to protect the interests of holders of Senior Bonds and Ambac.  As of May 4, 2017, there was no feasible possibility that the relevant default (passage of the Fiscal Plan Compliance Law) would be remedied.  On the evening of May 5, 2017, a case was commenced on behalf of COFINA under Title III of PROMESA.[4]  Because BONY failed to accelerate the Senior Bonds prior to the filing of COFINA's petition for relief under Title III of PROMESA, such non-automatic acceleration by BONY is now stayed.

11.    Once a default occurred, BONY's duties expanded beyond even those provided for in the Resolution to include broader common-law fiduciary duties requiring the Trustee to act.  Any contractual provisions in the Resolution that BONY may invoke as an excuse to ignore those duties are inapposite.  In a default scenario such as this one, BONY simply could not carry out its duties under New York law on behalf of Ambac and holders of Senior Bonds, while also acting as a fiduciary for holders of Subordinate Bonds.

12.    The holders of Subordinate Cash Pay Bonds have benefited most from BONY's failure to act, because they have been showered with cash payments drawn from COFINA's pool of assets that the Commonwealth is attempting to seize.  Conversely, the holders of Senior CAB Bonds that are senior in priority to holders of Subordinate Cash Pay Bonds but that are not paid current interest, were harmed every day that BONY failed to recognize an Event of Default and continued to make the interest payments to holders of Subordinate Cash Pay Bonds.  Moreover, if the Commonwealth succeeds in its attempt to unconstitutionally take COFINA's property, and thus renders COFINA insolvent, BONY will have harmed all holders of Senior Bonds.  And, if holders of Subordinate Bonds are ultimately found to be entitled to future payments due to

---

[4]On June 30, 2016, President Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which, among other things, provides a legal framework for adjustment of Puerto Rico debts and for the appointment of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board").  Pub. L. 114-187, codified at 48 U.S.C. § 2101 *et seq.*

BONY's failure to recognize an Event of Default and accelerate the Senior Bonds prior to the Title III filing, that will be further harm to Ambac and the holders of Senior CAB Bonds it insures.

13.     If BONY had fulfilled its obligations by declaring an immediate Event of Default and accelerating the Senior Bonds, it would have been assured that holders of Subordinate Bonds would receive nothing until holders of Senior Bonds are paid in full.

14.     By failing and refusing to recognize an Event of Default when required to do so, and by depleting COFINA's assets by paying periodic interest to holders of Subordinate Cash Pay Bonds, BONY breached its contractual, fiduciary, and other duties to Ambac and to the holders of Senior CAB Bonds that Ambac insures.  BONY is required to act as a fiduciary and to perform its duties with due care and as a prudent person would in managing its own affairs.  No prudent person would have sat by as BONY did while the Commonwealth sought to unlawfully and unconstitutionally seize assets it was duty-bound to protect.

15.     BONY must be held accountable for its deficient conduct to date in failing to properly fulfill its fiduciary duties and to ameliorate its inherent and intractable conflicts of interest.

## PARTIES

16.     Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004 and brings this action as an insurer of Senior CAB Bonds issued by COFINA and as a Bondholder itself. Ambac is a "Beneficiary" under the terms of the Resolution, as well as a specified third-party beneficiary of the Resolution.

17.     Defendant BONY is a New York state chartered bank with a principal place of business at 225 Liberty Street, New York, New York, 10007.  BONY serves as Trustee for a series of bonds issued by COFINA pursuant to the Resolution, as amended and supplemented.

## JURISDICTION AND VENUE

18.     This Court has personal jurisdiction pursuant to CPLR §§ 301 and 302, because Defendant is a resident of the State of New York and the acts complained of occurred in the State of New York.

19.     Venue is proper in this Court pursuant to CPLR § 503 because Defendant resides in New York County.

## FACTUAL BACKGROUND

### I.     The Commonwealth Creates COFINA After Facing Financial Crisis

20.     In 2006, Puerto Rico faced an exigent financial and economic crisis—at the time one of the worst in the Commonwealth's history.

21.     Among other measures designed to address the crisis, the Legislative Assembly enacted legislation to give the Commonwealth access to the capital markets at low and prudent cost through the creation of a securitization structure.  Through a series of statutes, the Legislative Assembly imposed for the first time a sales and use tax (the "SUT") and the entity that eventually became COFINA became the owner of a portion of the SUT revenue (the "Dedicated SUT Revenues").  Shortly thereafter, in early 2007, the Legislative Assembly passed Act 56, which officially created COFINA and authorized COFINA to issue bonds backed by the Dedicated SUT Revenues.

22.     The Dedicated SUT Revenues are, by statute, "*owned* by COFINA."  Act 56 expressly separated COFINA's funds from the Commonwealth's general funds (the "General Fund"), to prevent them from being diverted to the Treasury of Puerto Rico and used for other

purposes.  Act 56 specified that the Dedicated SUT Revenues "shall not constitute available resources of the Commonwealth of Puerto Rico *for any purpose*." (emphasis added).

23.     In July 2007, COFINA adopted the Resolution.

24.     Pursuant to the Resolution and statutory enactments, the transfer of the Dedicated SUT Revenues to COFINA is to be accomplished through the following mechanism:  (1) the Commonwealth collects SUT at a rate of 11.5%, (2) out of the 11.5% collected, 6% constitutes Dedicated SUT Revenues that are owned by and flow to COFINA until it has received SUT up to a cap specified in the Resolution that is sufficient for COFINA's total debt service for the fiscal year, (3) out of the remaining 5.5%, 1% flows to municipalities and 4.5% flows to the General Fund, and (4) Dedicated SUT Revenues in excess of the aforementioned cap flow to the General Fund.

25.     This structure was intended to ensure that necessary debt service by COFINA is funded.  Given the importance of this structure, and the fact that the Dedicated SUT Revenues are the sole source of recovery for the COFINA Bonds, the Resolution mandates that any interruption of Dedicated SUT Revenues flowing to COFINA constitutes an Event of Default.

26.     The isolation of COFINA from the credit risk of the General Fund, through COFINA's ownership of the Dedicated SUT Revenues and the statutory lien granted for the benefit of Bondholders, enabled COFINA Bonds to receive strong, investment-grade ratings, consistently higher than the ratings for the Commonwealth's general obligations bonds (the "GO Bonds").  In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that *separates* the revenue stream supporting the bonds *from* the Commonwealth of Puerto Rico, along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal."  It further

– 8 –

28538921

stated that, "[t]he legislative act creating COFINA . . . ***successfully separates*** and ***provides a priority interest*** in the Commonwealth's sales and use taxes for the [COFINA] bondholders." Moody's echoed these assessments.

## II.    The Commonwealth's Attempts To Attract Investors With Critical Rights And Protections

27.    In order to induce investors and insurers to lend their money to Puerto Rico through the COFINA structure and to obtain the insurance for the COFINA Bonds, both the Legislative Assembly and COFINA provided investors and insurers with critical rights and protections designed to assure them that COFINA's ownership of the property collateralizing their Bonds was guaranteed.

28.    Chief among these protections are the statutory segregation of the Dedicated SUT Revenues from the General Fund, and COFINA's ownership of the Dedicated SUT Revenues, as discussed above.  The Legislative Assembly explicitly promised that the Commonwealth would not impair the collection of the SUT and the rights of COFINA to the Dedicated SUT Revenues.  This statutory covenant was made for the express purpose of encouraging Bondholder and insurer reliance and in order to avoid any concerns about future impairment given the Commonwealth's beleaguered financial condition.  13 L.R.P.A. § 14(c).

29.    The legal structure of COFINA—including the creation of a property right in and statutory lien on the Dedicated SUT Revenues that was insulated from the risks of the General Fund, and the Commonwealth's agreement not to impair that property interest—was critical to the investors and their insurers, such as Ambac, who relied on the promise that they would have the benefit of a separate legal structure and a dedicated stream of payments.

28538921

**III.    The Resolution Aims To Preserve And Protect The COFINA Structure**

30.    Under the law and the Resolution, the Commonwealth and COFINA made contractual promises to prospective Bondholders and their insurers to assure them that even if the fiscal crisis continued, COFINA Bonds would be safe and protected from the political and economic risks affecting the General Fund.  Moreover, the Commonwealth promised that it would not limit or restrict COFINA's rights to meet its obligations to its Bondholders before the COFINA Bonds and interest were fully paid and retired.  These promises are found in the enabling legislation as well as the Resolution.  The Resolution sets forth (i) the terms governing all COFINA Bonds; and (ii) the rights of and protections for the holders and insurers of the COFINA Bonds.

31.    The Resolution creates a "continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued" pursuant thereto (the "Pledge").

32.    "Pledged Property" is defined under the Resolution to include, among other things, Dedicated SUT Revenues.  Section 501 of the Resolution provides that such funds are "pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds."  The Resolution further provides that Pledged Property shall "immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind."

33.    Because the COFINA Bonds are payable only by COFINA and, via the Pledge, the Dedicated SUT Revenues constitute the only source of funding for the repayment of the COFINA Bonds, the Resolution necessarily contains critical assurances concerning the

continuing flow of funds to COFINA.  Any interruption of revenues flowing to COFINA is an Event of Default.

34.     Investors and insurers, including Ambac, relied on these assurances when purchasing and insuring the COFINA Bonds.  In fact, Ambac is a "Beneficiary" under the terms of the Resolution.  Ambac is also a specified third-party beneficiary of the Supplemental Resolution.

35.     Moreover, the Resolution contains two key provisions intended to reflect and reaffirm the viability of COFINA and the sanctity of the Pledge.  These assurances were delivered through affirmative and negative covenants from COFINA and the Commonwealth included in the Resolution.

    a)  **<u>First</u>**, Section 705 of the Resolution requires COFINA to "at all times defend, preserve, and protect the pledge of the Pledged Property . . . against all claims and demands of all persons whomsoever."

    b)  **<u>Second</u>**, Section 706 provides, among other things, that the Commonwealth shall not "limit or restrict the rights . . . of [COFINA] to meet its obligations to its Bondholders."

36.     Because COFINA has no assets other than the Dedicated SUT Revenues and no other means of repaying Bondholders who lent billions of dollars to Puerto Rico, protection of the legal structure, and the enforcement of these promises and covenants, is essential to the integrity of the COFINA structure.  Recognizing the importance of these promises, the Resolution provides that "a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds" shall constitute an Event of Default, if such failure continues for 30 days after written notice, even when COFINA continues to make principal and interest payments to bondholders.  COFINA Resolution § 1101(ii).

IV.     **COFINA Issues $16 Billion Of Bonds**

37.     At the time of the Resolution's adoption in 2007, COFINA issued several types of COFINA Bonds, comprised primarily of Senior Bonds.  In total, during 2007 and 2008, COFINA issued approximately $5.2 billion in Senior Bonds.  The Senior Bonds, because they were backed by the Dedicated SUT Revenues, afforded the Commonwealth with crucial, lower cost financing compared with the GO Bonds.

38.     Ambac agreed to insure Senior CAB Bonds in a face amount of $808.5 million at issuance.

39.     Ambac is a provider of financial guaranty insurance, by which an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation.  Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.

40.     Under the relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay and, to the extent Ambac makes such payments, it obtains assignments of rights from the Bondholders, becomes an owner of the Bonds, and/or becomes subrogated to the rights of Bondholders and effectively steps into the shoes of such Bondholders.

41.     One reason governments and municipalities, including COFINA, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds.  Such insurance is especially important for issuers such as the Commonwealth and COFINA who have—and will have—significant borrowing needs, notwithstanding their lower credit ratings.

42.     In exchange for its agreement to insure certain Senior CAB Bonds, Ambac negotiated and received special consent rights.  Specifically, under the applicable bond insurance agreement, Ambac's consent is required *in addition to* Bondholder consent for any action requiring such consent.  Such actions include any amendments or other modifications to the Resolution, which would require the consent of a majority in principal amount of the COFINA Bonds outstanding.

43.     In addition, Ambac is a "Beneficiary" of the Resolution, as defined there. *See* Resolution (Beneficiaries are "(i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.").   And Ambac is also a third-party beneficiary in accordance with the Resolution.  *See* Resolution ("To the extent that this Resolution confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this Resolution, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.").

## V.     COFINA Issues Subordinate Bonds

44.     By 2009, in need of additional resources, the Commonwealth increased the amount of Dedicated SUT Revenues owned by COFINA and caused COFINA to issue the Subordinate Bonds.

45.     The Subordinate Bonds, which are subordinate to all Senior Bonds, carry higher interest rates and shorter maturities than most Senior Bonds, including the Senior CAB Bonds. In essence, the issuance of the Subordinate Bonds provided credit support to all Senior Bonds by effectively protecting the Senior Bonds from material declines in the Dedicated SUT Revenues owned by COFINA.

28538921

46.    In total, investors have purchased more than $16 billion of COFINA Bonds, consisting of essentially the following four types of debt:

a)  **Senior Cash Pay Bonds (approximately $4 billion principal amount outstanding)**:  entitled to periodic interest payments in cash, and mature between 2020 and 2057.

b)  **Senior CAB Bonds (approximately $3.7 billion accreted amount outstanding)**:  do not receive cash payments prior to stated maturity or acceleration.  Senior CAB Bonds mature between 2022 and 2056, and thus are the lowest weighted average yielding bonds issued by COFINA or any other Commonwealth entity.   Initial principal amount is reinvested at a stated compounded rate and, upon stated maturity or acceleration, holders are entitled to receive the initial principal amount plus any then accrued appreciation at the compounded rate.  Because these Bonds do not receive periodic payments, have distant maturities, and are solely obligations of COFINA, they are critically dependent on the sanctity of the COFINA structure and the corresponding pledge of Dedicated SUT Revenues.

c)  **Subordinate Cash Pay Bonds (approximately $8.2 billion principal amount outstanding)**:  absent an Event of Default, receive periodic interest payments in cash, and mature between 2017 and 2044.

d)  **Subordinate CAB Bonds (approximately $1.7 billion accreted amount outstanding)**:  do not receive cash payments prior to stated maturity or acceleration.

## VI.    The Differing Classes Of Bonds Give Rise To Conflicts Of Interest For The Trustee

47.    Despite the conflicting and competing rights and interests of these different types of COFINA Bonds, BONY has at all times since 2007 acted as the sole trustee for all COFINA Bonds.[5]

48.    An Event of Default triggers both contractual obligations and heightened extra-contractual duties for BONY as Trustee, as well as empowers the Trustee to accelerate all amounts outstanding under the Resolution.  Upon any such acceleration, the Resolution provides that the principal and "accrued interest on the accelerated Bonds shall become due and payable

---

[5] Section 1211 of the Resolution provides that "the rights, duties, privileges and immunities of the Trustee . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," which according to the Resolution is New York.

immediately, and the Trustee shall make demand for payment upon [COFINA] in an amount sufficient to pay principal . . . and interest accrued on the accelerated Bonds to the date established for payment thereof."

49.     Section 1101(2) of the Resolution provides that following an Event of Default, payments are to be made in accordance with "Class Priority," which is defined under the Resolution to mean that "Senior Bonds" are to be paid "first until full funding or payment thereof," with payments then due and owing to Senior Bonds entitled to *pari passu* treatment, and with payments flowing to the Subordinate Bonds only after the Senior Bonds are repaid in full.

50.     The remedy of acceleration thus affects each type of Bonds differently. For example, if, upon acceleration, insufficient funds exist to repay all Bonds in full, principal and accrued interest are repaid ratably among the Senior Cash Pay Bonds and Senior CAB Bonds in the first instance.  In other words, and assuming COFINA's inability to pay all outstanding amounts, an acceleration entitles the Senior Bonds to *pari passu* treatment, and cuts off any right of the Subordinate Bonds to payment.

51.     Any decision by BONY to decline to accelerate the Senior Bonds upon an Event of Default is therefore subject to the competing and conflicting interests of the Senior Bonds as compared to the Subordinate Bonds.  Thus, Section 810 of the Resolution empowers BONY to "appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the trustee may consider necessary or desirable."  However, BONY has not chosen to make such an election

28538921

under Section 810 to ameliorate the conflict of interest by the sole Trustee for holders of both the Senior Bonds and the Subordinate Bonds at the same time.  Instead BONY has continued to collect fees by continuing to serve in its conflicted role.

## VII.   BONY Fails To Protect Plaintiff In Response To Numerous Events Of Default

52.     As set forth below, there have now been seven separate Events of Default.  Under the Resolution, COFINA covenanted to "defend, preserve and protect" the COFINA structure and the rights of COFINA's creditors.  However, it has failed to do so, standing idly by as the Legislative Assembly has dismantled the COFINA structure.  Additionally, the Commonwealth covenanted, both in the Resolution and in COFINA's enabling legislation, not to take any action that would interfere with the rights of COFINA's creditors.  The Events of Default below flagrantly violated that contractual and statutory covenant.  Despite knowledge of these Events of Default, BONY failed to take appropriate action, in that it did not accelerate payment on all Senior Bonds, and instead continued making cash payments to the Subordinate Cash Pay Bonds to the detriment of Ambac and the holders of Senior Bonds it insures.

### A.      The First Event Of Default – The September 2015 Fiscal Plan

53.     Beginning in 2015, the Commonwealth began to abandon its commitment to honor its legal obligations to COFINA, its Bondholders, and Ambac.  On June 28, 2015, then-Governor García Padilla admitted in an interview to the New York Times that "[t]he debt is not payable," and stated that creditors must "share the sacrifices."

54.     Subsequently, the Commonwealth suggested that it may no longer honor its legal obligation not to impair COFINA's rights to the Dedicated SUT Revenues.   On September 9, 2015, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group")—a group established and empowered by an executive order issued by the former governor—published the Puerto Rico Fiscal Economic Growth Plan (the "September

– 16 –

2015 Fiscal Plan"). This Plan ignored the essential promise that COFINA's assets and liabilities are to remain separate from the General Fund of the Commonwealth. Instead, the September 2015 Fiscal Plan combined all of COFINA's revenues and its debt service in with the Commonwealth's assets and liabilities, which is inconsistent with COFINA's independent legal structure and disregards COFINA's property interest in the Dedicated SUT Revenues. The September 2015 Fiscal Plan publicly portrayed COFINA's debt obligations and assets as those of the Commonwealth, in direct contravention of the foundational premise of the COFINA structure. *See* September 2015 Fiscal Plan at 17, 61, and 62. This constituted a drastic departure from past precedent, in which the Commonwealth, consistent with the law, kept the debt obligations of COFINA and the Commonwealth separate in audited financial statements, government budgets, plans, and models.

55. Further, the September 2015 Fiscal Plan stated that, "the clawback of revenues supporting certain Commonwealth tax supported debt" may be available to "service all principal and interest on debt that has a constitutional priority."

56. In the wake of releasing the September 2015 Fiscal Plan, S&P immediately downgraded COFINA to a CC rating, just two notches above default, and stated that it believes "default or restructuring is highly likely and could take the form of either a missed debt service payment or a distressed exchange that we would characterize as a default," and that "all of Puerto Rico's tax-backed debt is highly vulnerable to nonpayment." *Street Insider, S&P Downgrades Puerto Rico's Tax-Backed Debt to 'CC', Outlook Negative*, Sep. 11, 2015.

57. Significantly, BONY was well-aware of the September 2015 Fiscal Plan and of the Commonwealth's and COFINA's breaches related thereto.

28538921

58.     In a letter dated September 24, 2015, that was shared with BONY, counsel for certain Bondholders warned COFINA that the September 2015 Fiscal Plan "materially misrepresent[ed] the essential nature of COFINA's indebtedness to the investing public, and materially harm[ed] COFINA and its bondholders."  The letter warned further that these representations "mis[led] the public by lumping the Commonwealth's own debt together with COFINA's," improperly attempted to "consolidate assets and liabilities of COFINA with that of the Commonwealth," and accused the Commonwealth of intending to "signal to the investing public at large that the Commonwealth's struggling fiscal health threatens the health of COFINA, ignoring the fact that insulation from the Commonwealth's other liabilities prompted the creation of COFINA in the first place."

59.     These misstatements, the letter explained, were inconsistent with Sections 201 and 501 of the Resolution, which together "make clear that the bonds issued by COFINA are not obligations of the Commonwealth."  The letter noted that COFINA's failure to correct these misstatements constituted a breach of COFINA's covenant in Section 705.  The letter therefore demanded that COFINA "promptly cure" these misstatements, "provide the necessary assurances of bondholders under the Resolution," and "untangle the COFINA debt and revenue from that of the Commonwealth."

60.     Despite having knowledge of the September 2015 Fiscal Plan, the September 24, 2015 letter, and the absence of any cure by the Commonwealth or COFINA, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the Senior Bonds or ceasing to make payments on the Subordinate Bonds. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

28538921

**B.      The Second Event Of Default – The February 1, 2016 Restructuring Proposal**

61.      On February 1, 2016, the Working Group published a document—the "Puerto Rico Restructuring Proposal" (the "February 1, 2016 Restructuring Proposal").  The February 1, 2016 Restructuring Proposal unlawfully referred to COFINA debt as the debt of the Commonwealth, and even included COFINA debt service and revenue within the Commonwealth's own debt and revenue calculations—a patent falsehood that is contrary to everything Bondholders and their insurers were told and promised when they purchased and insured COFINA Bonds.

62.      Once again, this time in a letter dated February 8, 2016, certain Bondholders advised COFINA and BONY of the breaches arising from the February 1, 2016 Restructuring Proposal.  The letter correctly characterized the February 1, 2016 Restructuring Proposal and the accompanying press release as the "antithesis of protecting and defending the Pledged Property for the benefit of Bondowners."  Specifically, the letter took issue with, among other things, the fact that the press release (i) "includes COFINA debt service within the Commonwealth's own debt service-to-revenue and then calculates that ratio with reference to the Constitutional limits on general obligation bonds of the Commonwealth," and (ii) "concludes by stating the Working Group's agenda is to 'improve the Commonwealth's credit-worthiness.'"

63.      The letter "demand[ed] that [COFINA] immediately publish its own press release renouncing the Working Group's treatment of and misstatements about COFINA" and demanded further that COFINA "appoint independent legal and financial advisors to protect and defend COFINA's Bondowners 'against all claims and demands of all persons whomsoever,' including any actions and misstatements by COFINA's own agents who have participated in the Working Group in breach of the Resolution."

64.     Again, BONY did not fulfill its duties to defend all Bondholders and their insurers.  Despite having knowledge of the February 1, 2016 Restructuring Proposal and the February 8, 2016 letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the Senior Bonds or ceasing to make payments to holders of Subordinate Cash Pay Bonds.  Instead, BONY ignored its irreparable conflict of interest.  BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

### C.     The Third Event Of Default – The 2016 Moratorium Act

65.     The Moratorium Act, enacted by the Commonwealth on April 6, 2016, empowered the Governor, by executive order, to declare "any government entity to be in a state of emergency" and, "if the executive order so provides, no payment on a covered obligation of such … government entity shall be made."  Moratorium Act, Article 201(a).

66.     Article 201(b)(ii) provided further that, "[d]uring the emergency period for any government entity," many rights and remedies would be restricted, including restrictions on the "exercise [of] any remedy, which remedy shall include any right of acceleration or termination . . . related to any covered obligation of such government entity, under any contract or applicable law as a result of . . . (A) non-payment of any obligation arising under or relating to any covered obligation of such government entity; [or] (B) breach of any condition or covenant under or related to any covered obligation of such government entity."

67.     Article 201(d) provided that "[i]f ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period . . . (ii) *any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof); [and] (iv) any statutory or other obligation to ensure payment of a*

*covered obligation as if this Act were not enacted (or take any action in furtherance thereof)*." (emphasis added)

68.     Article 702 stated that the Moratorium Act (and its provisions allowing the suspension of payments) would "take effect immediately upon enactment" and *included COFINA* in its definition of "government entity."  Section 103(t)(i).  This meant that under the terms of the statute, the Governor could suspend COFINA's payments and make the Dedicated SUT Revenues available for the Commonwealth's obligations.

69.     The Moratorium Act, therefore, radically undercut COFINA's autonomy, and was a breach of the Commonwealth's covenants.[6]

70.     On information and belief, in a letter dated April 6, 2016 sent to COFINA and BONY, counsel for certain Bondholders notified them that the "Moratorium Act constitute[d] an anticipatory breach of section 1101(1)(i) of the [COFINA] Resolution and Bonds because [it] permits the Governor to bar COFINA from making principal or interest payments" on any COFINA Bonds.

71.     The letter also advised COFINA and BONY that, in addition to the "improper restriction on COFINA paying its debts, the Moratorium Act further breaches sections 1101(1)(ii) of the Resolution," because it "restricts the rights of [Bondholders] to exercise remedies if the Governor issues an executive order applicable to COFINA and [by] suspending or modifying any obligations of COFINA to cause the transfer of money to pay Bonds or to ensure payment of Bonds."

---

[6] On January 29, 2017, the Moratorium Act was replaced by the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Emergency Act").  The Emergency Act extended the operative provisions of the Moratorium Act, through and including May 1, 2017, which term may be extended by the Governor for three months.  On information and belief, despite knowing of the severe threat the Emergency Act placed on the ability of COFINA to repay its Bonds, BONY did nothing to protect the Bondholders' and their insurers' interests in advance of, or in light of, the Emergency Act's enactment.

28538921

72.     In connection with that same notice, the Bondholders reminded COFINA and BONY of the continued Events of Default that had already occurred, namely the Events of Default arising from the September 2015 Fiscal Plan and the February 1, 2016 Restructuring Proposal, respectively.

73.     Despite having knowledge of the Moratorium Act and the April 6, 2016 letter, BONY again failed to take any actions to enforce these Events of Default or to otherwise protect Plaintiff by accelerating the Senior Bonds or ceasing to make payments to holders of Subordinate Cash Pay Bonds.  BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

**D.      The Fourth Event Of Default – The GO Bondholders' Litigations**

74.     BONY's failures continued as, in the summer of 2016, attacks on COFINA's structure and viability escalated.

75.     On June 21, 2016, the GO Bondholders commenced a litigation in the United States District Court for the Southern District of New York, No. 16 Civ. 4702, against the Commonwealth, then Governor García Padilla, the Treasury Secretary of the Commonwealth of Puerto Rico, and the Director of the Office of Management and Budget of the Commonwealth of Puerto Rico (the "Jacana Lawsuit").

76.     In the Jacana Lawsuit, the GO Bondholders alleged, *inter alia*, that the Dedicated SUT Revenues were "available resources" for the purposes of satisfying the GO Bonds.  The complaint directly challenged the rights of COFINA and the Bondholders with respect to the Dedicated SUT Revenues and the Pledged Property.  The GO Bondholders' complaint further alleged that funds transferred to COFINA, *i.e.*, the Dedicated SUT Revenues, are subject to clawback in favor of holders of GO Bonds.

77.     COFINA failed to take any steps to defend against such challenges.  Similarly, the Commonwealth took no substantive position in the Jacana Lawsuit.

78.     In a letter dated June 23, 2016, certain Bondholders reminded BONY that "COFINA has a clear contractual obligation to defend the Pledged Property and the Bondowners" in connection with the Jacana Lawsuit.  The letter, citing Sections 801 and 802 of the Resolution, also informed BONY that the "Trustee is likewise obligated to enforce the Resolution and the rights of Bondowners" and put "the Trustee on notice that there [was] a judicial challenge to COFINA's property and, pending resolution of that judicial challenge, the Trustee must demand that COFINA undertake all actions to preserve any and all property that is collateral of the [COFINA] Bondowners, including the retention of independent counsel to dispute the allegations in the Complaint."  The failure to do so, the letter added, "would result in a direct breach of the most fundamental promise in COFINA's Bond Resolution and would cause a shortfall of statutorily required amounts of pledged sales tax revenues."

79.     The letter cautioned that, "[g]iven COFINA's continuing refusal to hire independent advisors and its failure to acknowledge the existing Events of Default, the Trustee cannot sit idly by and close its eyes to the situation and how it could potentially impair more than $7 billion of Senior Bonds."

80.     On July 20, 2016, several GO Bondholders brought an action in the District Court for the District of Puerto Rico (the "Lex Claims Litigation").  Complaint, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. July 20, 2016) [Dkt. No. 1].  COFINA was added as a defendant on November 4, 2016.  *See* Second Amended Complaint, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Nov. 4, 2016) [Dkt. No. 78].

The GO Bondholders claimed that the PROMESA[7] stay did not bar their pursuit of certain claims challenging the COFINA structure, including the clawback of funds that had already been remitted to COFINA's accounts.  On February 17, 2017, the District Court entered an order allowing the case to proceed in spite of the PROMESA stay.  *See* Opinion and Order, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Feb. 27, 2017) [Dkt. No. 184].

81.     Neither the Commonwealth nor COFINA—both defendants in the *Lex Claims* litigation—appealed this order.  Instead, they acquiesced in the GO Bondholders' requests to pursue their challenge to the COFINA structure.  Certain of the Bondholders, together with the Oversight Board and Plaintiff Ambac, sought to enforce the litigation stay that Congress deemed critical for the orderly and negotiated resolution of bond claims.

82.     These Bondholders, the Oversight Board, and Ambac prevailed in the First Circuit Court of Appeals, which eventually stayed the litigation in its entirety.

83.     However, on March 17, 2017, while the appeal was pending in the First Circuit, the Commonwealth, through AAFAF, ignored its promise not to impair COFINA's right to the Dedicated SUT Revenues and issued a joint press release with the GO Bondholder plaintiffs in the Lex Claims Litigation, stating it "is not taking a definitive position on the merits of the constitutional questions [relating to COFINA's legal structure] at this time, [but] it will analyze the constitutional issues raised by the GO Bondholders.  In addition, the Government will urge Judge Besosa to decide the issues raised by the GO Bondholders by April 30, 2017, and not

---

[7] PROMESA provided for a temporary stay of certain litigation, which expired on May 1, 2017.  *See* PROMESA § 405(d)(1)(B); February 14, 2017 Letter from the Oversight Board.  Congress stated that the purpose of the stay was to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with creditors instead of defending numerous, costly creditor lawsuits . . . ." PROMESA § 405(n)(2).

28538921

support any efforts to defer or delay the resolution of the constitutional questions raised by the GO Bondholders until after the PROMESA litigation stay expires."

84.     COFINA provided no response to any of these statements and challenges to the COFINA structure and has thus failed to comply with the terms of the Resolution that require COFINA to give further assurances in support of the Bondholders' security interest in the Dedicated SUT Revenues, and to preserve, protect, and defend the COFINA structure and rights to the Dedicated SUT Revenues, including enforcement of the non-impairment covenant of the Commonwealth itself (Section 706).

85.     Despite having knowledge of COFINA's failure to defend in the Jacana Lawsuit and Lex Claims Litigation and all other instances of attack on its structure, as alleged *supra*, BONY failed to take any actions to enforce these Events of Default or to otherwise protect Plaintiff by accelerating the Senior Bonds or ceasing to make payments to holders of Subordinate Cash Pay Bonds.  BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Event of Default.

**E.     The Fifth Event Of Default – The March 13, 2017 Fiscal Plan**

86.     On March 13, 2017, AAFAF, on behalf of the Commonwealth and COFINA, submitted a joint fiscal plan (the "March 13 Fiscal Plan") to the Oversight Board.  The Oversight Board certified the March 13 Fiscal Plan the same day.  Once certified, the March 13 Fiscal Plan became binding on the Commonwealth and COFINA as a matter of federal law under PROMESA.

87.     The March 13 Fiscal Plan commingles COFINA's revenues, including the Dedicated SUT Revenues, and its debt service with the Commonwealth's assets and liabilities, ignoring COFINA's legal separateness from the General Fund.  The March 13 Fiscal Plan effects a taking of Bondholders' property interest in the Dedicated SUT Revenues and solidifies the

Commonwealth's breach of its non-impairment obligation under the COFINA Resolution. According to the March 13 Fiscal Plan, the total estimated cash flow available to pay debt service over the next ten years will be less than the debt service owed by COFINA alone during such period.  For example, COFINA's Dedicated SUT Revenues ranges from $724 million in 2018 to $1.031 billion in 2026, while the cash available for debt service under the March 13 Fiscal Plan ranges from $404 million in 2018 to $808 million in 2026.  *See* March 13 Fiscal Plan at 10.

88.     Even if all of the cash flow purportedly available to pay debt service reflected in the March 13 Fiscal Plan were remitted to COFINA—and it is not clear that the March 13 Fiscal Plan contemplates that remittance—the amounts remitted to COFINA would fall short of the Dedicated SUT Revenues in seven of the next nine years, including immediately in fiscal year 2018, which begins on July 1, 2017.  *See* March 13 Fiscal Plan at 27–28.  Indeed, over the term of the March 13 Fiscal Plan, COFINA will suffer a shortfall of over $1.4 billion even if all cash flow available to pay debt is earmarked for COFINA.  Consequently, in formulating the March 13 Fiscal Plan and submitting it for certification by the Oversight Board, the Commonwealth repudiated its obligations to COFINA, Ambac, and the Bondholders, has taken the property owned by COFINA that secures the Bondholders' investments by statutory lien, and has created new law that impairs Bondholders' and insurers' contractual rights.

89.     The March 13 Fiscal Plan identified no legal authorization for its taking of COFINA property, its violation of the COFINA statute, or its impairment of the contractual rights of Bondholders and insurers of COFINA Bonds (including Ambac).  Nor did the March 13 Fiscal Plan explain or even assert that it was necessary and reasonable to violate the rights of

Bondholders, as compared with other policy choices, in order to create a fiscal plan that complied with PROMESA.

90.     The March 13 Fiscal Plan constitutes a clear breach of the covenants of the Commonwealth.  And, inasmuch as COFINA takes no steps to counter the March 13 Fiscal Plan and the harm it poses to COFINA, Ambac, the Bondholders, and other investors, COFINA is in breach of its covenants.

91.     On March 27, 2017, certain Bondholders and an insurer of COFINA Bonds wrote to the Oversight Board informing its members that the Fiscal Plan violates the law "by failing to respect the COFINA Bondholders' lien on the assigned revenues granted to COFINA."

92.     Additionally, in a letter to BONY dated March 31, 2017, certain Bondholders informed BONY of the breaches in question and demanded that BONY take necessary steps to protect Bondholders, including by issuing notices of default and by refraining, in the interim, from making further payments on account of the COFINA Bonds.  The Bondholders demanded confirmation by April 4, 2017, that BONY will comply with such requests, but BONY failed to respond.

93.     BONY thus again failed to take appropriate measures to protect its investors and other insurers.

**F.      The Sixth Event Of Default – The Passage Of The Fiscal Plan Compliance Law**

94.     Implementation of the March 13 Fiscal Plan began in April 2017.  During an April 27, 2017 Puerto Rico Senate debate on the Fiscal Plan Compliance Law, Popular Democratic Party Senator José Nadal-Power remarked, "[h]ere the executive [branch] is being authorized to use the COFINA funds, the COFINA funds which are destined to pay

[B]ondholders, and now all of a sudden it is good to take the money that goes toward the payment of [B]ondholders and use them towards the end determined by the executive [branch]?"

95.     On April 27, 2017, the Legislative Assembly passed House Bill 938 titled "Law on Compliance with the Fiscal Plan."  This bill was signed into law by Governor Ricardo Rosselló on April 29, 2017 (the "Fiscal Plan Compliance Law").  The Fiscal Plan Compliance Law directly interferes with the rights granted to COFINA and constitutes multiple uncurable breaches of the Commonwealth's covenants.

96.     First, the Fiscal Plan Compliance Law diverts COFINA's revenues to the General Fund.  Chapter 6 of the Fiscal Plan Compliance Law amends Sections 3, 7, and 8 of Act No. 230 of July 23, 1974, the "Accounting Law of the Government of Puerto Rico," to provide that upon effectiveness of the Fiscal Plan Compliance Law, all special funds created by law for specific purposes will be credited to the General Fund and deposited in the current bank account of the Secretary so that he or she has full control of them.  Furthermore, the collections attributable to the additional 4.5% sales and use tax adopted in July of 2015 now flow directly into the General Fund beginning at the outset of the fiscal year, in contravention of the flow of funds established by the Resolution.  These acts are direct limitations or restraints on the rights granted to COFINA.  Specifically, the proceeds of the first revenues of the sales and use tax "shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico."  13 L.P.R.A. § 12.

97.     Second, Chapter 4 of the Fiscal Plan Compliance Law allows the Secretary of the Treasury of Puerto Rico, under certain conditions, to use COFINA's funds to cover a deficiency in the Commonwealth's cash flow to comply with the March 13 Fiscal Plan.  Specifically, Chapter 4 of the Fiscal Plan Compliance Law purports to order all Puerto Rico public

corporations and instrumentalities, without limitation or exception, to transfer to the Treasury Department any surpluses of generated revenues.  Those funds are to be considered as "available resources" of the Commonwealth and deposited by the Treasury Department in the General Fund to comply with liquidity requirements contemplated in the Fiscal Plan.  Article 4.03 expressly provides with respect to COFINA that the Secretary of the Treasury is authorized to use COFINA funds in an occasional manner, in compliance with certain conditions, to cover a significant deficiency in the cash flow or to comply with the March 13 Fiscal Plan.  This is a blatant taking of COFINA property and violation of the Resolution, which provides that the Pledged Property "shall be deposited directly in the FIA and shall be used exclusively" for the purposes listed in the statute, which purposes do not include funding a Commonwealth cash flow deficiency.  The Resolution further provides that the COFINA revenues shall not "be available for use by the Secretary of the Treasury."

98.     These events constitute multiple breaches of the Commonwealth's covenants and trigger an Event of Default.  By failing to recognize the Event of Default, BONY once again failed to take appropriate measures to protect its investors and insurers.

## F.     The Seventh Event Of Default – The Issuance Of The Commonwealth's Title VI Proposal

99.     The publication of the so-called "Proposal" under Title VI of PROMESA, filed publicly by AAFAF on the evening of April 28, 2017, constitutes a further repudiation of the COFINA structure, and overt breach of the covenants contained in the Resolution.  AAFAF was created under chapter 6 of Act No. 21 of 2016 to serve as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, public corporations, instrumentalities, subdivisions, and/or municipalities, and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing.  *See* Act No. 2016-21,

28538921

Section 602(a).  In Act No. 2 of 2017, the Commonwealth expanded AAFAF's powers to include, among other things, sole responsibility to renegotiate, to restructure, and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity.  *See* Act No. 2017-2 at 1.  In addition, AAFAF is the entity in charge of the collaboration, communication, and cooperation efforts between the Government of Puerto Rico and the Oversight Board.  AAFAF therefore acts as agent for and speaks for both the Commonwealth and COFINA in matters involving restructuring, including in making this Proposal.

100.    Two core aspects of the Proposal violate the COFINA structure.  First, the Proposal treats GO Bonds as having priority over COFINA Bonds, despite the fact that the revenues pledged to the COFINA Bonds are explicitly made unavailable for the payment of GO Bonds.  The Proposal makes plain that the SUT pledged to COFINA will no longer be segregated and devoted solely to the payment of COFINA Bonds, a structure the Commonwealth has covenanted to respect; instead, all SUT will be pooled into the General Fund, in violation of legislative and contractual provisions.  Second, the Proposal purports to treat holders of Senior Bonds *pari passu* with holders of Subordinate Bonds in violation of express contractual subordination provisions.  Utilizing a tool commonly referred to as a "death trap," the Proposal would distribute either (i) $6.9 billion in newly-issued Senior Bonds and $3.3 billion in Senior Cash Flow Bonds to all holders of COFINA Bonds *pari passu* if the holders of COFINA Bonds consent to such treatment; or (ii) $450 million of newly-issued Short Term Bonds only to holders of COFINA Senior Bonds, reflecting a 2.5% recovery on the outstanding COFINA Bonds, if holders of COFINA Bonds do not consent to the treatment in (i).  Offering holders of COFINA Senior Bonds what amounts to a Hobson's choice is a direct repudiation by the Commonwealth

of the contractual and statutory protections afforded to COFINA Senior Bondholders under the Resolution and a flagrant dereliction of COFINA's duty to defend, preserve, and protect the pledge of revenues and all rights of the Trustee, Beneficiaries, and Bondholders against all claims and demands.

101.    The Commonwealth affirmatively covenanted, in section 706 of the Resolution, to not "limit or restrict the rights that are by [COFINA's Enabling] Act granted or the rights of [COFINA] to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired."  The passage of the Fiscal Plan Compliance Law and issuance of the Commonwealth's Title VI Proposal constitute breaches of that covenant.

102.    In addition to the covenant by the Commonwealth, COFINA itself covenanted to "at all times, to the extent permitted by law, defend, preserve[,] and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries[,] and the Bondowners under the Resolution against all claims and demands of all persons whomsoever."  Section 705.  The failure by COFINA to protect itself from the Commonwealth's illegal and unqualified attack on its possession and control of the pledged revenues is a breach of COFINA's duty.  The Title VI Proposal, which was submitted by AAFAF, acting as the exclusive agent for not only the Commonwealth but also for COFINA, is another breach by COFINA.  Far from defending, preserving, or protecting the pledge of revenues to COFINA, the Title VI Proposal is a declaration of war on COFINA and its property.

103.    The Commonwealth's and COFINA's flagrant and incurable breaches of the Resolution, and clear intention to loot COFINA to meet Commonwealth expenses, constitute Events of Default under Section 1101.1(ii).  And BONY, acting as Trustee for COFINA Bonds

with conflicting interests, failed to take any actions to enforce the corresponding Events of Default or to otherwise protect holders of Senior Bonds and Plaintiff by accelerating the Senior Bonds.

104.    To date, and with regard to all Events of Default, BONY failed to prudently and reasonably investigate breaches of the Resolution (such as by seeking commitments or confirmations from the Commonwealth), failed to provide necessary notices of Events of Default to all Bondholders, and failed to take any actions to enforce the Events of Default or to otherwise protect Plaintiff by accelerating the Senior Bonds or ceasing to make interest payments with respect to the Subordinate Bonds.  BONY's refusal to take any such action to protect the holders of Senior Bonds and Plaintiff constitutes a negligent abdication of its duties as Trustee and a breach of its contractual and fiduciary obligations.  No prudent person would have failed to act in these circumstances where its property was under attack and may be hopelessly dissipated in the absence of action.

105.    On May 1, 2017, Ambac wrote to COFINA providing notice of COFINA and the Commonwealth's failures to observe and/or refusals to comply with the covenants and agreements set forth in the Resolution.  Ambac stressed that certain actions and inactions by COFINA and the Commonwealth—including the passage of the Fiscal Plan Compliance Law and the issuance of the Proposal and the failure by COFINA to respond—are "direct violations of covenants and agreements contained in Sections 705 and 706 of the Resolution[.]"  Ambac specifically noted that the breaches by COFINA and the Commonwealth are "incurable and therefore constitute an immediate Event of Default."   Finally, Ambac stressed that the "Commonwealth's and COFINA's flagrant and incurable breaches of the Resolution, and clear

intention to pillage COFINA to meet the Commonwealth expenses, constitute Events of Default under Section 1101(1)(ii)."

106.    Similarly, on May 1, 2017, BONY itself wrote letters to COFINA and AAFAF, complaining that the Fiscal Plan Compliance Law undermines the Pledge and demanding that COFINA and AAFAF by May 3, 2017 set forth in detail the actions COFINA and AAFAF "will take to defend, preserve, and protect the pledge of the Pledged Property against the Commonwealth's claim to the Pledged Property under the Fiscal Plan Compliance Law and any effort by the Governor to utilize the Pledged Property pursuant to the [Fiscal Plan Compliance Law]."

107.    Instead of providing the comfort that BONY sought, the Commonwealth and COFINA ignored BONY's letters, and on May 3, 2017, the Commonwealth filed a petition for relief under Title III of PROMESA (the "Title III Petition").  The case is pending in the United States District Court for the District of Puerto Rico under case number 17-cv-01578.

108.    Additionally, on May 5, 2017, the Oversight Board commenced a Title III proceeding on behalf of COFINA.

## VIII.    BONY's Failure To Withhold Payments

109.    On information and belief, starting in early 2017, certain Bondholders commenced discussions with BONY concerning upcoming February 1, 2017 payments to other Bondholders, for which BONY was holding funds already received from COFINA.  Among other things, the Bondholders demanded that BONY refrain from making such payments based on the many existing Events of Default and the continuing attacks by the Commonwealth and others on COFINA and its viability.  The Bondholders also demanded that BONY seek confirmation from the Commonwealth that it intends to stand by the COFINA structure.

28538921

110.    In a letter dated January 31, 2017, holders of Senior Bonds raised concerns with BONY's historic failures to act and protect them, and demanded that BONY "temporarily refrain from using [those funds] to make any payments on the COFINA Notes—including, without limitation, by delaying any principal or interest payments that may allegedly be due on February 1, 2017 . . . —until the Commonwealth and COFINA commit to defend the COFINA structure against all challenges."  The letter went on to point out that failure to do so would constitute a clear breach of BONY's duties to the COFINA Bonds, particularly in light of its "failures over the last 17 months to take necessary steps to protect the COFINA Notes and to address the Trustee's crippling conflicts of interest."

111.    In their letter, the holders of Senior Bonds reminded BONY that Events of Default "have plainly occurred and are continuing under the Resolution" and that they should have caused BONY to accelerate the Senior Bonds, entitling all Senior Bonds to payment in full prior to any payments being made with respect to Subordinate Bonds.  The holders of Senior Bonds also advised BONY of its inherently conflicted role as Trustee for both Senior and Subordinate Bonds.

112.    On February 1, 2017, Ambac also wrote to COFINA concerning the payments scheduled to be made on the same day to holders of Subordinate Cash Pay Bonds.  Ambac echoed the concerns in the January 31, 2017 letter from holders of Senior Bonds, pointing out that the disbursement of funds payable on February 1, 2017 would "favor cash pay bonds (including *subordinate* cash pay bonds) over senior capital appreciation bonds." (emphasis in original).

113.    Despite these warnings, on February 1, 2017, BONY distributed a payment to holders of Subordinate Cash Pay Bonds notwithstanding its actual knowledge of existing Events

of Default under the Resolution, of mounting attacks on the COFINA structure, and that the disbursement would risk a drastic impairment to the Senior CAB Bonds.

114.    At the time, BONY was aware of another then-recent event that should have caused BONY to investigate and to demand assurances from the Commonwealth. The Emergency Act, as first proposed, contained language that could have allowed the Governor to divert and to otherwise use Dedicated SUT Revenues.  While the Emergency Act was revised at the last minute before passage to remove such language, the initial inclusion of the language was so potentially damaging to COFINA and to the COFINA Bonds that it should have prompted action by BONY.

115.    On information and belief, BONY failed to investigate further or to seek any commitments or assurances from the Commonwealth.

116.    On April 30, 2017, counsel for Ambac wrote to BONY, notifying it again of the multiple, incurable breaches of COFINA and the Commonwealth's covenants and the corresponding Events of Default.  Ambac instructed BONY that, in light of the existing Events of Default and in accordance with the Resolution and the subsequent supplements, BONY should cease making payments to holders of Subordinate Bonds until the Senior Bonds are paid in full.

117.    Despite having knowledge of the Events of Default, on May 1, 2017, BONY, undeterred, went ahead and distributed cash interest payments to holders of Subordinate Cash Pay Bonds, causing harm to Ambac and the holders of Senior CAB Bonds Ambac insures.

IX.    **BONY Finally Acknowledges The Defaults And
Serves A Default Notice On COFINA But Fails to Accelerate the Senior Bonds**

118.    On May 4, 2017, counsel for certain Bondholders wrote to the Trustee, emphasizing that the noticed defaults are incurable, and as such, "the events described in the Trustee's notice gave rise to Events of Default under the Resolution."  The letter stressed that "it

is imperative in order to protect the COFINA Senior CAB Notes for which the Trustee serves as trustee, that the Trustee immediately accelerate all COFINA Notes."

119.    That same day, Ambac and a number of holders of Senior Bonds (together representing more than 25% of the principal amount of outstanding Senior Bonds) wrote to BONY pursuant to Section 1102(1) of the Resolution.  The letter noted that, "as explained in numerous letters to the Trustee, there have occurred and continue to occur multiple Events of Default under the Resolution."  Ambac and the holders of Senior Bonds demanded three things. First, Ambac and the holders of Senior Bonds demanded that "the Trustee declare the principal of and accrued interest on all senior COFINA Bonds outstanding to be immediately due and payable[.]"  Second, Ambac and the holders of Senior Bonds demanded that "the Trustee make demand for payment upon COFINA in an amount sufficient to pay principal of . . . and interest on the accelerated Bonds to the date established for payment thereof."  And finally, Ambac and the holders of Senior Bonds demanded that "the Trustee proceed to protect its rights and the rights of the COFINA Senior Bondholders through the exercise of any and all remedies" in the Resolution.

120.    Also on May 4, 2017, BONY finally served the Default Notice on COFINA.  In the Default Notice, BONY described a number of defaults, specifically that, "the Commonwealth's enactment of the Fiscal Plan Compliance Law and COFINA's failure to take any action to defend, preserve, and protect its ownership and control of the Pledged Property in connection with the enactment of the Fiscal Plan Compliance Law constitute defaults under sections 705 and 706 of the Resolution."  BONY's Default Notice also explained that "[t]he Fiscal Plan Compliance Law interferes with COFINA's rights and undermines the pledge of the Pledged Property to the Trustee."  In particular, it notes that "Chapter 6 of the Fiscal Plan

28538921

Compliance Law diverts the Pledged Property to the Commonwealth's general fund in direct violation of COFINA's enabling legislation.  Chapter 4 of the Fiscal Plan Compliance Law authorizes the Governor, under certain conditions, to use the Pledged Property to cover deficiencies in the Commonwealth's cash flow or to comply with the Commonwealth's Fiscal Plan."  The Default Notice observes that "[a]s a result of these limitations and restrictions on COFINA's rights and ability to meet its obligations to Bondowners, the Commonwealth's enactment of the Fiscal Plan Compliance Law constitutes a default under section 706 of the Resolution."

121.    BONY's May 4, 2017 Default Notice also stressed that "COFINA's failure to take any action to defend, preserve, and protect its ownership and control of the Pledged Property and the pledge of the Pledged Property to the Trustee against the Commonwealth's claim upon the Pledged Property asserted in the Fiscal Plan Compliance Law constitutes a default under section 705 of the Resolution."

122.    BONY's Default Notice also reminded COFINA that Ambac had provided notice of default to COFINA on May 1, 2017[8] and that, also on May 1, 2017, the Trustee demanded that COFINA explain by May 3, 2017 in detail the actions COFINA "will take to defend, preserve, and protect the pledge of the Pledged Property against the Commonwealth's claim to the Pledged Property under the Fiscal Plan Compliance Law and any effort by the Governor to utilize the Pledged Property pursuant to the Fiscal Plan Compliance Law."  The Default Notice explained that COFINA had not responded to the Trustee's demand for further assurances, and that such failures constitute additional defaults under Section 704 of the Resolution.

---

[8] While the Default Notice states that BONY wrote to COFINA on May 1, 2016, BONY's letter was sent on May 1, 2017.

123.    However, instead of immediately declaring an Event of Default and accelerating the Senior Bonds, as it had time and again been requested to do, a seriously conflicted BONY refused to act, and instead provided COFINA 30 days to cure what was an obviously incurable default.  As of May 4, 2017 when BONY finally sent its Default Notice, there was no feasible possibility that the relevant default (passage of the Fiscal Plan Compliance Law) would be remedied.

124.    Yet BONY failed to recognize the immediate Event of Default and accelerate the Senior Bonds, as demanded by holders of Senior Bonds and Ambac in accordance with the Resolution, and as dictated by the BONY's fiduciary duties.

125.    Thereafter, on the evening of May 5, 2017, a case was commenced on behalf of COFINA under Title III of PROMESA.  Because BONY failed to accelerate the Senior Bonds prior to the filing of COFINA's petition for relief under Title III of PROMESA, such non-automatic acceleration by BONY is now stayed.

X.    **BONY's Actions And Inactions Have And Will Cause Plaintiff To Suffer Millions Of Dollars In Damages**

126.    Because the Senior CAB Bonds insured by Ambac carry long-dated maturities with no current cash payments (unlike the Subordinate Cash Pay Bonds), they are at severe risk to the extent the COFINA structure is compromised.  Given the attack on COFINA's pool of assets, any interest payments made by BONY to the holders of Subordinate Bonds dissipated assets that should have gone to pay holders of Senior Bonds.

127.    Unlike holders of Senior CAB Bonds, holders of Subordinate Cash Pay Bonds received periodic interest payments in cash.

128.    In an Event of Default, BONY, as Trustee, had the authority, as well as the duty, to accelerate the Senior Bonds.  BONY received a demand from 25% of the holders of Senior

Bonds, pursuant to Section 1102(1) of the Resolution, to accelerate the Senior Bonds.  It also received approval from Ambac to accelerate the Senior CAB Bonds that it insures.

129.    Upon acceleration, the Trustee applies any available funds according to a priority waterfall set forth in the Resolution.  This waterfall structure has five basic categories:  (1) fees on credit or liquidity facilities; (2) interest; (3) principal; (4) monoline claims for reimbursement or subrogation; and (5) miscellaneous payments.  If, however, all Senior Bonds are accelerated, interest and principal are paid ratably without preference (rather than interest being paid before principal).

130.    At least seven separate Events of Default existed under the Resolution and yet BONY took no actions to protect Plaintiff from such defaults by accelerating the Bonds or taking any other remedial measures, such as ceasing payments.  Even BONY itself has belatedly conceded that defaults have occurred, defaults which simply cannot be cured.  Once such a default occurred, BONY's duties expanded beyond those provided for in the Resolution to include broader common-law fiduciary duties.  Any contractual provisions in the Resolution that BONY invokes as its excuse not to fulfill those duties are inapposite.

131.    In sum, BONY operated and continues to operate under egregious conflicts of interest that prevent it from properly carrying out its duties and responsibilities to Plaintiff.

132.    Ambac notified BONY of the multiple Events of Default that have occurred, authorized BONY's acceleration of the Senior CAB Bonds that Ambac insures, and further demanded that BONY cease all interest payments to holders of Subordinate Bonds.  Yet BONY refused to take appropriate action.

133.    On May 2, 2017, Ambac filed the Complaint in this action, which sought, inter alia, an order enjoining BONY to accelerate the Senior Bonds.  Time was of the essence, because

it was widely anticipated that that COFINA could file a Title III case at any time.  Nonetheless, BONY did not act.

134.    Due to the filing of a Title III case on behalf of COFINA, Ambac is no longer seeking an order directing BONY to accelerate the Senior Bonds in this Complaint.  However, Ambac still asserts that a non-conflicted Trustee for the Senior Bonds would take the position that the Senior Bonds were automatically accelerated or, to the extent not automatically accelerated, would accelerate the Senior Bonds or move to lift the stay and accelerate the Senior Bonds.

135.    Plaintiff has been directly and proximately harmed by BONY's actions, and as a result, has been damaged in an amount to be determined at trial.

## FIRST CAUSE OF ACTION
## Breach of Fiduciary Duty

136.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

137.    BONY owes a fiduciary duty to Plaintiff.  BONY's fiduciary obligations included, without limitation, duties to protect the interests of Plaintiff, to investigate both its own conflicts of interest and potential Events of Default, and to make prudent decisions concerning the exercise of appropriate remedies, whether contractual or extra-contractual, to address the same.

138.    BONY breached its fiduciary duties by, among other things, (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate potential Events of Default including, but not limited to, those alleged herein; (iii) failing to accelerate the Senior Bonds and withhold payments to holders of Subordinate Cash Pay Bonds; and

(iv) otherwise failing to act in the best interest of Plaintiff or to protect the interests of holders of Senior Bonds.

139.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Senior Bonds.  BONY continued to make interest payments to holders of Subordinate Cash Pay Bonds, knowing full well that by so doing, it was improperly depleting a limited pool of assets to the severe and irreparable detriment of holders of Senior Bonds.

140.    BONY's material breaches of its fiduciary duties directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### Breach of Contract

141.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

142.    The Resolution is a valid contract between COFINA and, *inter alia*, BONY, in its capacity as Trustee, and Plaintiff.

143.    Plaintiff is entitled to enforce BONY's performance as Trustee.  Plaintiff is a Beneficiary of the Resolution, as that term is used therein.  Furthermore, Plaintiff is "explicitly recognized as being a third-party beneficiary . . . and may enforce any such right, remedy[,] or claim conferred, given or granted" in either the Resolution or Supplemental Resolutions.

144.    Plaintiff performed its obligations under the Resolution.

145.    An Event of Default occurred as early as September 9, 2015, and, as described above, numerous other related Events of Default occurred over the following 19 months.  BONY

28538921

and its responsible officers had and continue to have actual notice that Events of Default occurred.

146.    BONY breached the Resolution by failing to provide Plaintiff with notice of Events of Default and by failing to recognize Events of Default and accelerate the Senior Bonds. BONY continued to make interest payments to holders of Subordinate Cash Pay Bonds, knowing full well that by so doing, it was improperly depleting a limited pool of assets to the severe and irreparable detriment of holders of Senior Bonds.

147.    BONY's breaches directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## Breach of the Implied Covenant

148.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

149.    At all relevant times, including after the Events of Default discussed herein, BONY owed Plaintiff, as a Beneficiary and express intended third-party beneficiary under the Resolution and Supplemental Resolutions, a duty of good faith and fair dealing that required BONY to ensure that it did not, by act or omission, injure Plaintiff's rights to receive the benefits and protections provided for under the Resolution.

150.    BONY materially breached its duty of good faith and fair dealing under the Resolution and related implied covenants by, among other things, (i) failing to reasonably investigate and recognize Events of Default; (ii) failing to accelerate the Senior Bonds or to withhold payments to holders of Subordinate Cash Pay Bonds; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution, thereby depriving Ambac of the fruits of the contract.

28538921

151.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Senior Bonds.  BONY continued to make interest payments to holders of Subordinate Cash Pay Bonds, knowing full well that by so doing, it was improperly depleting a limited pool of assets to the severe and irreparable detriment of holders of Senior CAB Bonds.

152.    BONY's breaches of those implied covenants directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**<u>Gross Negligence/Breach of Trust</u>**

153.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

154.    BONY owed Plaintiff extra-contractual duties to perform its obligations with due care and avoid any conflicts of interest.  BONY's acts and omissions breached those duties by, among other things, (i) failing to prudently investigate at least seven Events of Default; (ii) operating under conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, failing to appoint separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith.

155.    BONY acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Senior Bonds.  BONY continued to make interest payments to holders of Subordinate Cash Pay Bonds, knowing full well that by so doing, it was improperly depleting a limited pool of assets to the severe detriment of holders of Senior CAB Bonds.

28538921

156.    BONY's grossly negligent breach of those duties has directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment**

157.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

158.    As alleged herein, actual and justiciable controversies exist between the parties with respect to the rights, duties, and obligations of the parties due and owing under New York law and the Resolution.

159.    In addition to, and in the alternative of, their other claims for damages asserted herein, Plaintiff is entitled to a declaratory judgment declaring, *inter alia*, that:

a.    BONY breached its fiduciary duties owed to Plaintiff by (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate at least seven Events of Default; (iii) failing to accelerate the Senior Bonds and to withhold payments to holders of Subordinate Cash Pay Bonds; and (iv) otherwise failing to act in the best interest of Plaintiff or to protect their interests;

b.    BONY breached the Resolution by (i) failing to provide Plaintiff with notice of the Events of Default; (ii) failing to recognize an Event of Default; (iii) failing to accelerate the Senior Bonds; and (iv) failing to withhold payments, as it is required to do;

c.    BONY breached its duty of good faith and fair dealing under the Resolution and related implied covenants by (i) failing to reasonably investigate potential

Events of Default; (ii) failing to accelerate the Senior Bonds or withhold payments to holders of Subordinate Cash Pay Bonds pending an investigation into the ongoing Events of Default; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution;

d.   BONY acted negligently and breached its duties to Plaintiff by (i) failing to reasonably investigate potential Events of Default; (ii) becoming subject to conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, failing to appoint separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith; and that

e.   Ambac has the authority to remove BONY as Trustee under Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007.

## SIXTH CAUSE OF ACTION
### Injunctive Relief

160.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

161.   Ambac has the authority to remove BONY as Trustee under Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, which provides that "The Trustee (or Paying Agent) may be removed at any time, at the request of Ambac Assurance, for any breach of the Resolution set forth herein."

162.   As set forth above, BONY has breached the Resolution.

163.    Ambac requests that BONY resign or be removed as Trustee for the Senior Bonds.

164.    Accordingly, this Court should direct BONY to resign as Trustee for the Senior Bonds.

*[Remainder of page intentionally left blank.]*

28538921

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against BONY as follows:

(a)     Awarding direct damages in favor of Plaintiff against BONY in an amount to be proven at trial;

(b)     A declaration that (i) BONY breached its fiduciary and other duties to Plaintiff; (ii) BONY breached the Resolution; and (iii) BONY breached the covenant of good faith and fair dealing implied in the Resolution;

(c)     A declaration that Ambac may remove the Trustee pursuant to Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007;

(d)     A declaration that BONY suffers from a conflict of interest under New York law and a decree that BONY must resign as Trustee for the Senior Bonds; and

(e)     Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 22, 2017

                              CURTIS, MALLET-PREVOST,
                                 COLT & MOSLE LLP

                              By:   /s/ Theresa A. Foudy
                                    Steven J. Reisman (sreisman@curtis.com)
                                    Theresa A. Foudy (tfoudy@curtis.com)
                                    Jacques Semmelman (jsemmelman@curtis.com)
                                    Michael J. Moscato (mmoscato@curtis.com)
                              101 Park Avenue
                              New York, New York 10178-0061
                              (212) 696-6000

                              *Attorneys for Plaintiff*

28538921